UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

JUDITH H. GREER,                        )
                                        )
        Plaintiff,                      )        No. 7:17-CV-120-REW-EBA
                                        )
v.                                      )
                                        )        OPINION AND ORDER
JOSEPH E. KAMINKOW, et al.,             )
                                        )
        Defendants.                     )

***  ***  ***  ***

Joseph E. Kaminkow and Benita Riley Kaminkow[1] seek summary judgment. DE

#21 (Motion). Judith Greer opposed. DE #23 (Response). Defendants replied. DE #25

(Reply). The matter is ripe for consideration. For the following reasons, the Court

**DENIES** the motion. A jury must assess the merits of Greer's negligence claim.

## I.      BACKGROUND[2]

On September 17, 2015, Greer slipped and fell while working at (cleaning) the

home where Riley's daughter, Whitney Slone, lived, on Wilmington Lane in Lexington.

At the time, Kaminkow and Riley owned the home. *See* DE #21-1, at 8. They permitted

Slone (along with, at the time, a man and one child) to live there rent-free, although Slone

did pay applicable utilities and taxes. DE #24-2 (Riley Depo.), at 11 (Depo. p. 10); *see*

*also* DE #21-1, at 2 (stating that the purpose of the home was "to provide a dwelling for

---

[1] This defendant reports that her "proper name" is Benita J. Riley. *See, e.g.*, DE #1-1, at
6. Accordingly, the Court refers to her as "Riley" in this Opinion. No party disputes that
the proper person is before the Court.
[2] Under the summary judgment standard, the Court assesses the facts in favor of Greer,
the non-movant. *Matsushita Elec. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356
(1986).

Riley's daughter"). The Court has seen no lease and no indication of a binding legal tenancy between the owners and Whitney Slone. Greer was (functionally, at least) an employee of Riley and Kaminkow; Defendants themselves say that Greer "was employed" by and "had worked for Riley since March of 2004." *Id*;[3] 1-2 (Complaint) at ¶ 5; 1-1 (Answer) at ¶ 5-7 (calling Greer "domestic help").

On the day at issue, Riley directed Greer to go to Wilmington Lane to clean. DE #24-1, at 20. Riley and Kaminkow owned two Lexington homes, and Greer cleaned or worked at both, depending on the needs and the couple's direction. Greer began performing common household chores and ultimately began moving accumulated garbage and boxes from the garage to the street for anticipated trash pickup. *Id.* at 21-23. Greer's basic version of the story—which is what primarily matters in the current case context—is that while she was moving a large box filled with garbage down the driveway toward the street, she stepped on a separate, previously unseen, box in the driveway, causing her to slip and ultimately fall. In Plaintiff's own words:

---

[3] Kentucky generally recognizes a broad meaning of "employee." *See, e.g.*, *Ratliff v. Redmon*, 396 S.W.2d 320, 324 (Ky. 1965) ("The term 'employee' is defined by most statutes to include every person in the service of another under any contract of hire, express or implied."). Riley essentially described an employer-employee relationship with Greer. *E.g.*, DE #24-2, at 12-13 (Depo. pp. 11-12) (describing meeting Greer and employing her as a "housekeeper"); *id.* at 25 (Depo. p. 24) (recognizing that Greer "worked for" her); *id.* at 36 (Depo. p. 35) (referring to Greer's "salary" and "Christmas bonus"); *id.* at 57 (Depo. p. 56) ("[S]he was on salary."); *but see id.* at 15 (Depo. p. 14) (stating that she did not provide Greer with "workers' comp insurance or anything like that"). Greer agreed that Riley "employed" her. DE #24-1 (Greer Depo.), at 9; *but see* DE ##1-2 (Complaint), at 2 ¶ 6 (Greer stating that she "was not an employee of Joseph E. Kaminkow and Benita R. Kaminkow"); 1-1 (Answer), at 7 ¶ 5 (Defendants stating their "understanding" that Plaintiff was "an independent contractor"). Notably, Kaminkow affected where Greer worked, DE #24-1 (Greer Depo.), at 19-20, and he was involved in trying to secure a post-fall release from Greer. DE 24-2, at 36 (Depo. p. 35) ("[W]e need to get a release[.]").

I had taken several garbage bags down, so I got a hold of the box and was pulling the box down, I don't know whether I had one or two in my hand, . . . and I was going down backwards, but the driveway is slanted at an angle, pretty good angle, and evidently, the wind had blowed [sic] this box, it was a rather large box, it was maybe an inch and a half to two inches thick, dog carrier came in it, a metal dog carrier, and it wasn't on the ground the first couple of times I took garbage down, and Herbie down, and whenever I started down and was pulling the box down, I stepped on the box and started falling backwards. [A]nd if you are, whether it be like ice on a driveway is the only way I can describe it, you can't get your footing, you know. You are on the box, I could not get footing enough to stand up and I was falling backwards. . . . And I fell. I actually fell on two bags of garbage.

*Id.* at 23-24; *see also id.* at 39 (Q: "So why do you think you fell?" A: "Because I stepped on the box and could not-- as I was trying to catch my footing, there was nothing to grab on to[.]" Q: "Did the box kind of slide with you?" A: "I think so."); *id.* at 40 (describing the fall like being "on ice," "trying to catch your footing"). Greer described falling, sort of pinwheeling down the driveway, from the point she first stepped on the box to the point she landed on the ground. Greer Dep. at 39–40. She testified that she first encountered the box on the driveway itself, although she landed in the street.

The parties have litigated the case, and Defendants now seek summary judgment.[4] They make two primary arguments: first, that they owed Greer no duty, and second, that even if they owed a duty, they did not breach. The Court has evaluated all briefing and the full record, and addresses each argument in turn.

## II.    STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court must construe the evidence and draw all

---

[4] There was no direct witness to the fall other than Greer herself.

reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec.*, 106 S. Ct. at 1356; *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 F.3d at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106. S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). However, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 106 S. Ct. at 2552; *see also id.* at 2557 (Brennan, J., dissenting) ("If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's

evidence is insufficient to establish an essential element of the nonmoving party's claim." (emphasis in original)).

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511; *Matsushita Elec.*, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Such evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp v. FDIC*, 187 F. App'x 428, 444-45 (6th Cir. 2006).

## III. ANALYSIS

Greer levels a common-law negligence claim against Kaminkow and Riley. "The elements of a negligence claim are (1) a legally-cognizable duty, (2) a breach of that duty, (3) causation linking the breach to an injury, and (4) damages." *Patton v. Bickford*, 529 S.W.3d 717, 729 (Ky. 2016).[5] "Duty presents a question of law, whereas breach and injury are questions of fact for the jury to decide. . . . Causation presents a mixed question of law and fact." *Id.*

Beginning in 2010, the Kentucky Supreme Court has effected "seismic" change in the Commonwealth's negligence law, at least relating to premises. *See Grubb v. Smith*,

---

[5] The parties agree that substantive Kentucky law applies in this diversity case; the Court, accordingly, undertakes no independent choice-of-law analysis. *Gahafer v. Ford Motor Co.*, 328 F.3d 859, 861 (6th Cir. 2003).

523 S.W.3d 409, 415-21 (Ky. 2017), *reh'g denied and modified*, (Aug. 24, 2017) (narrating the evolution); *Shelton v. Ky. Easter Seals Soc., Inc.*, 413 S.W.3d 901, 904 (Ky. 2013) (stating a desire to further Kentucky's "slow, yet steady, progress to modernize our tort law and eliminate unfair obstacles to the presentation of legitimate claims").[6] The core of the high court's reasoning aims to advance a "determined effort" to "limit holdings" that a premises hazard "is 'not unreasonable as a matter of law,' to those rare instances where they are justified." *Grubb*, 523 S.W.3d at 418 (majority opinion). The court's "intention [is] to return most . . . cases to jury consideration[.]" *Id.*

Federal courts have recognized this: "[T]he Kentucky Supreme Court has repeatedly and explicitly declared that, under comparative fault, the unreasonableness and foreseeability of the risk of harm is normally a question for the jury to determine in deciding whether the defendant breached its duty of care in all but the rarest of circumstances." *Dunn v. Wal-Mart Stores E., LP*, 724 F. App'x 369, 374 (6th Cir. 2018). As Judge Stivers cogently summarized, Kentucky's negligence law "has evolved from a blunt question of . . . duty to a more nuanced analysis of breach and causation." *Wiley v. Sam's Club, Inc.*, No. 3:14-CV-54-GNS, 2015 WL 3687440, at *2 (W.D. Ky. June 12, 2015), *aff'd*, 632 F. App'x 263 (6th Cir. 2016).

---

[6] The effort began with *Kentucky River Medical Center v. McIntosh*, 319 S.W.3d 385 (Ky. 2010), and continued via *Dick's Sporting Goods, Inc. v. Webb*, 413 S.W.3d 891 (Ky. 2013), *Shelton*, *Carter v. Bullitt Host, LLC*, 471 S.W.3d 288 (Ky. 2015), *Goodwin v. Al J. Schneider Co.*, 501 S.W.3d 894 (Ky. 2016), *Grubb*, and, most recently, *Hayes v. D.C.I. Properties-D KY, LLC*, 563 S.W.3d 619, 623 (Ky. 2018) ("We have not altered this basic 'formula' in negligence cases, specifically premises liability cases, since our decision in [*McIntosh*.]"). The Court has carefully considered every word of these cases.

## A.    Duty

Defendants[7] first contest whether they owed Greer a duty.[8] As a beginning point, and to provide a workable framework for the duty inquiry, the Court views the relevant association between Defendants and Slone as most comparable to a landlord-tenant relationship.[9] The Court later explores other potential duty origins.

### 1.    Landlord Duty

"When a tenant maintains complete control and possession over the premises and the landlord has no contractual or statutory obligation to repair, the landlord is only liable for 'the failure to disclose known latent defects at the time the tenant leases the premises.'" *Jaimes v. Thompson*, 318 S.W.3d 118, 119 (Ky. Ct. App. 2010); *see also Warren v. Winkle*, 400 S.W.3d 755, 759 (Ky. Ct. App. 2013). If, on the other hand, there is a portion of the premises "retained by the lessor for the common use and benefit of a number of tenants," the landlord's duty is to "exercise ordinary care to keep in a

---

[7] Defendants made no specific duty argument as to either of them, individually. The analysis thus collectively applies to both named defendants.

[8] Contrary to Defendants' assertion in reply that they merely contested *which* duty applied, *see* DE #25, at 1-2, they plainly, in the underlying motion, contested duty existence altogether. To quote, for example, *the very first page* of the memorandum: "Kaminkow and Riley did not owe Greer a duty and therefore, cannot be found negligent." DE #21-1, at 1; *see also id.* at 7 ("Kaminkow and Riley did not owe any duty to Greer, in regards to the September 17, 2015 incident, for two reasons."). The Court proceeds with an analysis fairly addressing the true scope of Defendants' arguments.

[9] The relationship, of course, was not a traditional landlord-tenant one. There is no proof of a then-existing lease agreement or other contract. Slone did not pay rent; she did  pay taxes and utilities, perhaps only as a moral obligation or exercise. The arrangement, really, was simply a caring mother providing her daughter a place to live out of goodwill and affection. Still, Defendants owned the home, and permitted Slone to live in and occupy it.

Defendants raise the landlord-tenant argument, DE #21-1, at 8-9, and evaluating it on its own terms avoids potentially knotty questions about the precise reach of the doctrine in Kentucky (*e.g.*, whether it solely regulates contractual landlord-tenant relationships, or whether it covers arrangements with *practical* similarities).

reasonably safe condition the premises reserved for the common use of his tenants." *Carver v. Howard*, 280 S.W.2d 708, 711 (Ky. 1955).[10] This case, though, is not about any duty Defendants owed Slone.

In situations falling into the first category, a landlord owes a like (comparatively slight) duty to a tenant's guest or invitee.[11] *See Starns v. Lancaster*, 553 S.W.2d 696, 697 (Ky. Ct. App. 1977). The chief duty, quite logically, in that circumstance, falls on the tenant—the person asking the guest to her property. *See id.* The relevant rules are worthy of extended quotation:

---

[10] The Kentucky Court of Appeals has explicitly rejected (in unpublished opinions) the argument that the Kentucky Supreme Court's recent negligence-related decisions call into question the enduring utility of older landlord-tenant cases. *See, e.g.*, *Groves v. Woods*, No. 2016-CA-1546-MR, 2018 WL 560417, at *4, *6 (Ky. Ct. App. Jan. 26, 2018), *review denied*, Aug. 8, 2018; *Washington v. WB Holdings, LLC*, Nos. 2014-CA-157-MR, 2014-CA-189-MR, 2017 WL 2889545, at *3 (Ky. Ct. App. July 7, 2017). This seems logical, to the Court, given *Grubb*'s explicit distinctions between land possessors and owners (a topic explored *infra*).

[11] "Kentucky law remains steadfast in its adherence to the traditional notion that duty is associated with the status of the injured party as an invitee, licensee, or trespasser." *Hayes v. D.C.I. Properties-D KY, LLC*, 563 S.W.3d 619, 623 (Ky. 2018) *and Smith v. Smith*, 563 S.W.3d 14, 17 (Ky. 2018) (contemporaneously released decisions each quoting *Shelton*, 413 S.W.3d at 909); *but see Smith* at 20-23 (Chief Justice Minton, dissenting) ("I would instead abandon the distinction between licensees and invitees in favor of a unitary duty of reasonable care owed to all non-trespassing entrants . . . . [This] would eliminate the complex, confusing, and unpredictable state of premises-liability law and replace it with a rule which focuses the jury's attention upon the pertinent issue of whether the landowner acted as a reasonable person would under the circumstances. I would adopt such a standard and put an end to the perpetual state of confusion that is our common-law system of premises liability.").

In Kentucky, "[a] person who comes upon the property of another without any legal right to do so is a trespasser . . . . A person who comes on the land of another with the possessor's consent is a licensee. . . . [A] person with business dealings with the possessor who comes upon the property is an invitee." *Carney v. Galt*, 517 S.W.3d 507, 511 (Ky. Ct. App. 2017). The parties do not dispute that Greer was an invitee. *See* DE ##21-1, at 6-7; 1-2, at 3 ¶ 9. "Generally speaking, a possessor of land owes a duty to an invitee to discover unreasonably dangerous conditions on the land and either eliminate or warn of them." *Shelton*, 413 S.W.3d at 909 (internal quotation marks omitted).

At common law, a tenant in full and complete control of premises which he occupies owes the same duty to persons coming there **upon his invitation**, express or implied, to keep such premises in a reasonably safe condition as he would if he were the owner, and is prima facie liable for damages proximately caused by defects in or dangers on the premises that reasonably could have been avoided by appropriate care taken by him, irrespective of whose duty it was, as between landlord and tenant, to make such repairs. **Such invitees**, when seeking redress for injuries sustained by them by reason of defects in the premises, **must seek such redress from the tenant and not from the landlord**, at least in the absence of any statutory provision making the landlord liable. . . .

As a general rule, a landlord who, without covenanting to repair, and without knowledge of latent defects, puts a tenant into full possession and control of the demised premises, not intended for public purposes, and which are free from defects of construction constituting a nuisance, will not, in the absence of statute, be liable for personal injuries sustained on the demised premises, by reason of the defective condition thereof, by the tenant and others entering on the premises **under the tenant's title**.

*Id.* (emphases added). Other cases confirm these principles and focus on the importance of *the tenant* inviting the involved third party. *See Washington*, 2017 WL 2889545, at *2 ("Kentucky courts have consistently held guests and invitees **of a tenant** are owed the same duties as the tenant." (quoting *Lambert v. Franklin Real Estate Co.*, 37 S.W.3d 770, 776 (Ky. Ct. App. 2000) (emphasis added)); *Jaimes*, 318 S.W.3d at 120 (affirming no landlord duty to a tenant's visiting friend).

The critical fact that takes this case outside operation of that default rule is that Greer, here, was *the landlord's* invitee—not the tenant's. DE #24-1, at 20 (Greer: "Benita[] said . . . why don't you go help Whitney today."). The record indicates that Riley asked Greer to work at Wilmington Lane on the day at issue, taking this situation outside cases like *Starns*'s purview. *See, e.g.*, *Rogers v. Redmond*, 727 S.W.2d 874, 875 (Ky. Ct. App. 1987) (recognizing, citing the *Starns* "such invitees" language, that there are "certain situations" when "a third person" injured "on rented premises" would have a

"cause of action" against the landlord). This is one of those situations. The Court rejects the notion that a landlord actively inviting a third party to property she owned could avoid negligence liability by retreating to an old duty rule forged in different factual fires. A landlord in that scenario should be accountable to the same extent as any other inviter for the state of the property she asked the third party to enter. Greer was not some friend of Slone's, visiting the home at Slone's invitation and without Riley's knowledge.

Additionally, also critically, if Riley had the authority to authorize Greer to enter and work in the Wilmington Lane home, Slone did not "maintain[] complete control and possession over the premises." *Jaimes*, 318 S.W.3d at 119-20; *cf. Grubb*, 523 S.W.3d at 423 (opinion of Hughes, J.) (store manager with "no authority to make repairs[] clearly did not have 'the entire charge of the land or building'"). Riley, further, straightforwardly said that anyone "living at the house at that time" had to have her "permission" to do so. DE #24-2, at 30 (Depo. p. 29). Indeed, Greer even had a key to the Wilmington Lane home. DE #24-1, at 86.[12] The Court thus concludes that these facts do not come within the purview of the first landlord duty category.

The facts strongly point to the Owners having full control and charge of the premises. Slone effectively paid no rent for occupancy. *See* DE #24-2 (Riley Depo.), at 10 (noting no rent; the Owners "ask her to pay . . . the utility bills [and] taxes to give her

---

[12] The parties do not address what rights, if any, Slone could enforce as to her occupancy of the residence. Defendants likely could have, on these facts, terminated any implied tenancy or tenancy at will (if one existed) on proper notice. *See, e.g.*, *Shinkle v. Turner*, 496 S.W.3d 418, 421-22 (Ky. 2016); *Ellis v. Ellis*, 275 S.W.2d 909, 910 (Ky. 1955); *Morgan v. Morgan*, 218 S.W.2d 410, 411-12 (Ky. 1949); *Leavitt v. Maykell*, 89 N.E. 1056, 1058 (Mass. 1909); *51 Park Props. v. Messina*, 720 A.2d 773, 775 (Pa. Super. Ct. 1998). These are weighty topics the litigants declined to brief; the Court, therefore, likewise declines to extensively explore the issues. At a minimum, there is no proof that Slone had any contract-based rights.

some responsibility"). She bore no responsibility for repairs. Indeed, Slone simply would notify Greer (the Owners' servant), and Greer would manage the assignment and contracting of any repair work. *See id.* at 44, 57. Similarly, the Owners handled maintenance of the grounds. *See id.* at 44. Perhaps most importantly, Riley and Kaminkow dispatched Greer, their agent, into the home on a weekly basis (as and when they chose) to perform extensive domestic cleaning. *See id.* 14, 30–31. This encompassed the entire house and expressly extended to trash removal. Thus, Slone did nothing more than live in the house—the Owners had and took complete charge of all upkeep, maintenance, and even transient cleaning. Far from complete control, Slone arguably had no control over the operation, maintenance, and condition of the home. How, then, does the Court assess whether Defendants owed Greer a duty and, if so, its contours? The Court perceives it must evaluate, under Kentucky law, (1) the premises-liability duty, and (2) the universal duty, owed by all to all.

### 2. Premises-Liability Duty

Under the first option, "[g]enerally speaking, a possessor of land owes a duty to an invitee to discover unreasonably dangerous conditions on the land and either eliminate or warn of them." *Shelton*, 413 S.W.3d at 909; *see also Webb*, 413 S.W.3d at 897 ("[L]andowners owe a duty to invitees to discover unreasonably dangerous conditions on the land and either correct them or warn of them."). "Of course, possessors are not required to ensure the safety of individuals invited onto their land; but possessors of land are required to maintain the premises in a reasonably safe condition." *Id.* Put another way, a "landowner owes a duty of reasonable care to those individuals invited onto the landowner's property, and the landowner must inform invitees of or eliminate any

unreasonable dangers that would otherwise be undetected." *Id.* at 898; *see also Carter*, 471 S.W.3d at 291-99 (using both "landowner" and "land possessor").

These quotations make plain the lexical imprecision with which cases refer to "landowners" and "land possessors," in this context. Attempting to distinguish landowners from land possessors is Defendants' chief no-duty argument. *See* DE #21-1, at 6-9; *but see* DE #23, at 1 (Plaintiff urging the view that the premises-liability duty applies to "either owners **or** occupiers of land" (emphases in original)). In sequential sentences, for example, *Webb* uses both terms, with no indication of a difference in meaning. Other cases, too, use the terms as synonyms. *See, e.g.*, *Smith v. Joy Techs., Inc.*, 828 F.3d 391, 399 (6th Cir. 2016) ("The preceding passage emphasizes the responsibility of a '**land-possessor**,' not the manufacturer of a product. Its application to the case at hand is therefore unjustified because the manufacturer of a product does not maintain control over the product in the same way that a **landowner** exercises continuous control over its premises." (emphases added)); *McIntosh*, 319 S.W.3d at 393 ("An invitee can always try to avoid dangers of which he is aware, but only **land possessors and owners** can legally remove them." (emphasis added)); *id.* at 397 (Schroder, J., dissenting) ("Until today, a **landowner or possessor of land** could not be held liable to invitees who were injured by open and obvious dangers." (emphasis added)); *Carter*, 471 S.W.3d at 299 (using "land possessor" and "landowner" in sequential sentences as synonyms); *Shelton*, 413 S.W.3d at 906 (same).

Maybe this makes good sense. After all, one possible meaning of "possessor" is one who owns something. *Cf.* Black's Law Dictionary 1201 (8th ed. 2004) (defining "possession" to mean "something that a person owns"). In that milieu, the Kentucky

courts seem well-justified to treat the terms as synonymous. But, maybe the terms deserve more nuanced treatment. To "possess" something, a different definition says, is "to have [it] in one's actual control." *Id.* Using that framework, the Court could conceive of numerous scenarios in the vagaries of life where the owner and the person in *actual control* of property are not fully identical—including, *e.g.*, a standard landlord-tenant relationship, or (perhaps as here) an owner permitting gratuitous (full and exclusive) use of property by another.

Enter *Grubb*, a 3-3 split decision (on the relevant issues) by the Kentucky Supreme Court.[13] One bottom-line takeaway is clear: all six participating Justices agreed that "landowner" and "land possessor" are *not* always synonymous. *See* 523 S.W.3d at 422 (opinion of Hughes, J.) ("As the *Restatement (Second) of Torts* § 328E notes, the land's owner is not necessarily its possessor for the purposes of this rule."); *id.* at 433-34 (opinion of Venters, J.) (contemplating that "one may be liable as a 'possessor of land' for some hazards, but not for others, depending on the degree of control one is authorized to exercise" and stating that "several individuals may qualify as a 'possessor' of the same premises at the same time"). All participating Justices also agreed, per the cited excerpts, that the premises-liability duty also properly applies (only) to land possessors. The Court takes those propositions as law post-*Grubb*.

Where the rubber meets the road, however, is the meaning of the word "possessor." Justice Hughes's cadre explained that, in general, "the possessor of premises

---

[13] Section 2 of *Grubb* (the relevant portion here), written by Justice Hughes, earned the support of Chief Justice Minton and Justice Cunningham. Justices Keller and Wright, on the other hand, joined the "separate opinion" of Justice Venters addressing the issues. Justice VanMeter was "not sitting." Perhaps the sharp split was unsurprising; *Shelton* and *Carter*, after all, were 4-3 decisions.

for premises-liability purposes is that person . . . in occupation of the premises (or entitled to immediate occupation) with the intent to control them." *Id.* at 422. Justice Venters's trio applied a more flexible standard, reasoning that "one need not have 'complete control' of the premises to incur liability as a 'possessor of land,'" that "one may be liable as a 'possessor of land' for some hazards, but not for others, depending on the degree of control one is authorized to exercise," and that, accordingly, "several individuals may qualify as a 'possessor' of the same premises at the same time, depending upon their specific responsibilities." *Id.* at 433-34.

At least as a summary judgment topic, the Court views the Owners (the Defendants) as having control over the premises for purposes of measuring duty. There was no formal lease, and Slone occupied the house as, almost completely, a matter of Riley's benevolence. Riley and Kaminkow wholly controlled permission over who could live at the house. The Owners had responsibility for and control over all external and internal repairs. The Owners had full access and gave Greer a key and total discretion to enter the home. Further, the Owners sent Greer in, on a regular and recurring basis, to perform thorough domestic cleaning at the house, to include removal of trash accumulated in the garage.

The Court notes several specifics about the garbage disposition practices, which are at the core of Greer's alleged fall. Riley knew that Slone (and the other adult resident) did not handle their trash in a typical way. Rather than putting refuse in a bag and then a trash bin, the family would open the internal kitchen door, leading to the garage, and simply throw a full trash bag (or one of many discarded delivery boxes) onto the garage floor. This frustrated Riley, who criticized the laziness of the approach. DE #24-2 (Riley

Dep.), at 30–31 ("[T]hey would basically open the door . . . throw the garbage bags out there, throw the Amazon boxes out there, and infuriate me because Jeff is able-bodied, but that's what he would do. And then when Judy would come over there, she would have to take all that out to the trashcans."). She also remarked that the residents kept the garage so full of junk and trash that it could not be used for parking. *See id.* at 41–42 ("But they always have so much junk in it there could never be a car in it because all the trash is in there."). The Owners knew the inhabitants' practices, acquiesced (with full control of occupancy specifics), and indeed actively facilitated them by providing Greer's cleaning labor. *See Warren v. Winkle*, 400 S.W.3d 755, 760–62 (Ky. Ct. App. 2013) (landowners may be liable "if they had actual or constructive notice of a defective condition").

The Owners both owned and possessed the premises, and as such, they owed the typical safe-premises duty imposed by Kentucky law. *See McIntosh*, 319 S.W.3d at 388 ("As a general rule, land possessors owe a duty to invitees to discover unreasonably dangerous conditions on the land and to either correct them or warn of them."), *holding modified on other grounds by Shelton v. Kentucky Easter Seals Soc., Inc.*, 413 S.W.3d 901 (Ky. 2013).

### 3.    Universal Duty

Under the second option described above, the "concept of liability for negligence expresses a universal duty owed by all to all." *Webb*, 413 S.W.3d at 897. Because there is an "overarching duty of reasonable care," "every person owes a duty to every other person to exercise ordinary care in his activities to prevent foreseeable injury." *Id.*; *see*

*also* DE ##21-1, at 9 (recognizing the universal duty); 25, at 1 (Defendants not disputing that the universal duty "applied to them").

A landowner or land possessor, no doubt, owes "a general duty of reasonable care" separate from "the more specific duty associated with" premises-liability notions. *Shelton*, 413 S.W.3d at 910; *see also id.* at 908 (instructing courts to ask whether the parties' relationship "outlined" a particular duty, "[a]long with the defendant's general duty of care"); *id.* ("First and foremost, a land possessor is subject to the general duty of reasonable care."); *Webb*, 413 S.W.3d at 897 ("Generally speaking, a landowner is not exempt from the overarching duty of reasonable care that pervades our negligence law.").[14]

Additionally, "as [a] general rule, all persons have [a] duty to use ordinary care to prevent others from being injured as the result of their conduct." *Kendall v. Godbey*, 537 S.W.3d 326, 331 (Ky. Ct. App. 2017). Although "the so-called universal duty is anything but universal," it undoubtedly applies "to instances where the harm resulting from a defendant's act was foreseeable." *Pearson v. Pearson*, 552 S.W.3d 511, 515 (Ky. Ct. App. 2018); *see also Isaacs v. Smith*, 5 S.W.3d 500, 502 (Ky. 1999) (same: "[S]uch a

---

[14] Further, the universal duty applies even if a hazard is open and obvious. *See Shelton*, 413 S.W.3d at 915 ("To allow the [open-and-obvious] doctrine to eliminate a landowner's general duty of reasonable care would do great violence to this state's development of a modern tort regime."); *Carter*, 471 S.W.3d at 296 ("[O]penness or obviousness of a hazard by itself cannot obviate a landowner's duty of reasonable care or any liability resulting from a breach of that duty."); *id.* at 297 ("The open-and-obvious nature of a hazard is, under comparative fault, no more than a circumstance that the trier of fact can consider in assessing the fault of any party, plaintiff or defendant."). Greer said that she had not seen the culprit box before slipping. *See* DE #24-1, at 23 (noting she was "going down" the driveway "backwards" and that the box "wasn't on the ground the first couple of times I took garbage down"); *id.* at 32 ("I don't really remember seeing it, you know, I don't have a picture in my head saying it was there[.]"); *id.* (stating she would have picked up a box she saw "laying in the driveway").

duty applies only if the injury is foreseeable."); *Grand Aerie Fraternal Order of Eagles v. Carneyhan*, 169 S.W.3d 840, 849 (Ky. 2005) (stating that the universal duty "is not boundless").

Foreseeability, in turn, is almost always a jury question—a fact-specific "analysis . . . belong[ing] . . . in the hands of the fact-finders, the jury." *Shelton*, 413 S.W.3d at 904. The inquiry centers on whether "injury of some kind to some person within the natural range of effect of the alleged negligent act could have been foreseen." *Pearson*, 552 S.W.3d at 515 (quoting *T & M Jewelry, Inc. v. Hicks*, 189 S.W.3d 526, 531 (Ky. 2006)). "The extent of foreseeable risk at the time of the defendant's alleged negligence depends on the specific facts of the case and cannot be usefully assessed for a category of cases; small changes in the facts may make a dramatic change in how much risk is foreseeable. Thus, courts should leave such determinations to the trier of fact unless no reasonable person could differ on the matter. . . . **Accordingly, the foreseeability of the risk of harm should be a question normally left to the jury under the breach analysis**." *Shelton*, 413 S.W.3d at 913-14 (emphasis added). "[T]he question of foreseeability and its relation to the unreasonableness of the risk of harm is properly categorized as a factual one, rather than a legal one." *Id.* at 916; *see also Carter*, 471 S.W.3d at 298 (stating that *Shelton* "established that foreseeability applies to breach of the general duty of ordinary care"); *Kendall*, 537 S.W.3d at 331-32 (recognizing that *Shelton* "restructured the issue of foreseeability in relation to duty," "embraced the universal duty of care concept," and

"remov[ed] foreseeability as a part of the duty analysis," effectively making duty "a given element in negligence actions").[15]

This is not a scenario where the Owners' "own conduct has not created a risk of harm" and the Court is imposing on them a duty "to control the conduct of a third person to prevent him from causing harm to another." *Carneyhan*, 169 S.W.3d at 849. To the contrary, Riley knew of the trash and box accumulation in the garage and specifically invited Greer into harm's way. Riley's request with situational knowledge—her "conduct"—"created a risk of harm" where one would have otherwise been absent, had Greer not gone to Wilmington Lane.[16] *Cf. Restatement (Third) of Torts* § 19 ("The

---

[15] The Court also notes, without extensively exploring (because the parties did not address this concept), the notion that an "employer-employee relationship," which Defendants and Greer (at least functionally) had, is "a special relationship" for purposes of the "duty to warn" that Kentucky law contemplates. *See, e.g.*, *Johnson v. United Parcel Serv., Inc.*, 326 S.W.3d 812, 816-17 (Ky. Ct. App. 2010). If anything, this solidifies the Court's conclusion as to duty existence.

[16] The dueling opinions in *Grubb* require additional discussion on this point. The origin of and justification for Justice Hughes's broad statement—"[I]t has *never* been the law in Kentucky that, outside a small number of exceptions, one has a duty, much less a 'universal duty,' to protect others from dangerous conditions one has not caused or created"—are unclear, to the Court. *See* 523 S.W.3d at 426 (opinion of Hughes, J.) (emphasis in original). The three Justices cited no Kentucky law or precedent for that proposition and provided little explanation of the "small number" of applicable exceptions. *See id.* The Court's review of relevant law, as described in this Opinion, does not fully square with Justice Hughes's. Justice Venters, on the other hand, also speaking for three Justices, quoted the standard recitation of the "universal duty" with no such qualification. *See id.* at 532 (opinion of Venters, J.).

Neither opinion, both of which speak for an equal number of Justices, states, establishes, or changes the law. *Cf. Smith v. Brannin*, 79 Ky. 114, 119-20 (1880) (holding that when "the members of this court are equally divided in opinion," "the opinion of the judges who agree with the court below" becomes only "the law of the case," not generally applicable precedent); *Durant v. Essex Co.*, 74 U.S. 107, 112 (1868) ("If the judges are divided, . . . no order can be made."); *Etting v. U.S. Bank*, 24 U.S. 59, 78 (1826); *Alticor, Inc. v. Nat'l Union Fire Ins. Co.*, 345 F. App'x 995, 1002 (6th Cir. 2009). Indeed, Kentucky courts (in *Pearson*, *Kendall*, *Rodgers* (cited *infra*), and others) have not

conduct of a defendant can lack reasonable care insofar as it foreseeably combines with .

. . the improper conduct of . . . a third party."); *Restatement (Second) of Torts* § 302A. "It

is well established . . . that one's general duty to exercise due care includes the duty not

to place another person in a situation in which the other person is exposed to an

unreasonable risk of harm through the reasonably foreseeable conduct (including the

reasonably foreseeable negligent conduct) of a third person."[17] *Lugtu v. Cal. Highway*

*Patrol*, 28 P.3d 249, 256 (Cal. 2001); *see Britton v. Wooten*, 817 S.W.2d 443, 447-52

recognized a change in "universal duty" law post-*Grubb*. The Court follows suit and applies the "universal duty" as it existed and exists in Kentucky law pre- and post-*Grubb*.

The Court highlights a few additional topics. First, Justice Hughes did not address the meaning of several words used in the pronouncement—*e.g.*, "dangerous conditions," "caused," and "created." No party disputes that Riley did not, personally, throw trash and boxes into the Wilmington Lane garage. Did she *help* "cause" the condition by allowing the known practice to persist on her property? What degree of contribution is sufficient for the duty to apply? *Cf. Grubb*, 523 S.W.3d at 434 (opinion of Venters, J.) (reasoning, in part, that a store manager could be liable when her "failure" to act "constitute[d] a substantial factor causing or contributing to Grubb's injury"). Is the "dangerous condition" merely the presence of the excessive trash and boxes alone?

Similar problems plague an earlier reference to the "universal duty" in the opinion. *See id.* at 424 & n.15. First, of course, Justice Hughes explicitly declined to "speculat[e] as to how this 'universal duty' might apply" to the case, rendering the comments dicta. *See id.* at 424. Still, three Justices remarked that the "universal duty is usually thought to apply" to "risks created by the actor," not "risks not created by the actor." *See id.* at 424 n.15. The use of "usually" implies the presence of exceptions, the contours of which the Justices did not address. Further, the Justices did not define what they meant by "risks" (compared with, *e.g.*, "dangerous conditions," used later in the same opinion) and "created by" (compared with, *e.g.*, "caused or created"). Justice Hughes's opinion provides little guidance in these critical areas.

[17] *Shelton*, despite extolling the virtue of a jury deciding reasonableness, somewhat confusingly provided a list of "open-and-obvious danger[s]" that "may not create an unreasonable risk," including "a small pothole in the parking lot of a shopping mall[,] steep stairs leading to a place of business[,] or perhaps even a simple curb." 413 S.W.3d at 914. The Kentucky Supreme Court later washed its hands of the list: "This Court did not state that those conditions 'do not' create [an unreasonable] risk." *Goodwin*, 501 S.W.3d at 899. The high court further, in *Grubb*, "decline[d] the invitation" to adopt a "trivial defect" rule, explicitly criticizing *Shelton*'s "small pothole" hypothetical. *See* 523 S.W.3d at 420-21 (majority opinion).

(Ky. 1991); *cf. Gaither v. Justice & Public Safety Cabinet*, 447 S.W.3d 628, 638 (Ky. 2014) (contemplating protection when an actor "should reasonably foresee that his negligence is likely to put a specific individual in harm's way at the hands of a specifically-known and identifiable third party"); *Doe v. Franklin*, 930 S.W.2d 921, 927 (Tex. Ct. App. 1996) ("In essence, a person has a duty to not place another in harm's way of foreseeable criminal activity."); *Haeg v. Geiger*, No. A06-1840, 2007 WL 2472545, at *5 (Minn. Ct. App. Sept. 4, 2007) (countenancing a duty "not to place [a person] in harm's way by parking in front of [a] tee box"). Riley could not ask Greer to traverse a known minefield and expect to be absolved from liability for an exploding mine.

The Court holds, per this analysis, and as the defense has admitted, *see* DE #25, at 1, that Defendants owed Greer the universal duty to exercise ordinary care to prevent foreseeable injury.[18] Taking the Kentucky Supreme Court at its direction "not to short circuit . . . cases by easy resort to the old-school type of 'no duty' ruling" that plagued prior jurisprudence, *Grubb*, 523 S.W.3d at 416 (majority opinion); *see also Shelton*, 413 S.W.3d at 907-10 ("Practically speaking, th[e] analysis will almost always begin with the breach question, given the broad sweep of the general duty of reasonable care. . . . We write today to shift the focus away from duty to the question of whether the defendant has fulfilled the relevant standard of care."); *id.* at 907 (denouncing courts making "obtuse no-duty determination[s]"), the Court concludes that Greer's claim survives element 1

---

[18] The Court rejects the argument that Defendants owed no duty because the fall occurred on public property. *See* DE #21-1, at 7-8. The contention needs no belaboring. Greer testified that the fall occurred on the home's driveway. DE #24-1, at 23-24, 33, 38; *see also id.* at 41-42 (describing how, post-fall, she "pulled" her body to try to reach her phone, which had "fl[own] out of [her] pocket" and into "the street"). A jury could, thus, reasonably so conclude, even if Greer told Slone a "vastly different" story originally. *See* DE ##24-3 (Slone Depo.), at 25 (Depo. p. 24); 24-2, at 22, 29 (Depo. p. 21, 28).

scrutiny. As a matter of premises ownership/possession and as a matter of universal duty, the Owners owed Greer, their invitee, a duty of care.

B.      *Breach*

The second issue is whether a jury could reasonably find that Defendants breached.

The question of breach is factual and typically inappropriate for summary determination by the Court. *See Patton*, 529 S.W.3d at 729 (categorizing breach as a "question[] of fact for the jury to decide"); *Grubb*, 523 S.W.3d at 421 (majority opinion) (holding that the question of the "unreasonableness of the risk of harm" of a condition is "almost always . . . properly categorized as a factual one"); *see also Dunn*, 724 F. App'x at 374 ("[T]he Kentucky Supreme Court has repeatedly and explicitly declared that . . . the unreasonableness and foreseeability of the risk of harm is normally a question for the jury to determine in deciding whether the defendant breached its duty of care in all but the rarest of circumstances."). As some examples, an "unreasonable risk could be created by a 'simple curb' outside an emergency room (*McIntosh*), wires on the floor near a hospital bed (*Shelton*), ice in the parking lot of a hotel after a winter storm (*Carter*), the slipperiness of a wet hotel bathtub (*Goodwin*), and a small pothole between the pumps of a gas station (*Grubb*)." *Id.* Further, Kentucky courts have found summary judgment inappropriate "because the reasonableness of the risk and foreseeability of the harm were questions of fact in cases where the plaintiff tripped on the corner of a pallet protruding from the bottom of a store display, fell when stepping backward onto uneven pavement at a gas station, or tripped over a concrete flower pot placed near the exit of a banquet hall." *Id.* at 374-75.

Giving Plaintiff the inferences due, a rational jury could find that the Owners breached their duty of care, resulting in Greer's fall. As noted earlier, the Owners had full access to and control over the premises. They took responsibility for all maintenance, upkeep, and even domestic cleaning. The cleaning obligation extended to trash removal, and the residents' trash habits included a unique and risk-creating practice. The inhabitants would haphazardly throw their trash—loose boxes and bags—onto the garage floor. The heap was large enough to block any other use of the garage. The Owners charged Greer with cleaning the mess, including moving all trash into the bins (the Herbie and/or the Rosie) and getting everything to the curb.

A few important notes about the dynamics in September 2015. Greer was not a young woman; she was in her late sixties at the time of the incident, *see* DE #20-3 at 1, and she had demonstrated some physical problems during employment. *See* Riley Dep. at 17. During the time at issue, Greer alone handled trash collection and disposal. Riley remarked that her daughter was physically unable and her daughter's companion simply unwilling to do the task. *See id.* at 30–32. There was so much trash generally, that the garage otherwise was unusable. *See id.* at 42.[19] It may have been as much as 1.5 months

---

[19] Evidently, the Owners' agent (Greer), was the only individual to routinely enter the garage for any reason. She did so at the Owners' explicit behest. Thus, even if Slone had an implied tenancy in the remainder of the house, the Owners' control over the garage was sufficiently exclusive that their duty, as to that area, would be no less than a non-leasing landowner. *Warren v. Winkle*, 400 S.W.3d 755, 761 (Ky. Ct. App. 2013) ("[A] landlord can be responsible for dangerous conditions in areas not demised to a tenant and that remain in the landlord's exclusive control."); *id.* ("[A] tenant's knowledge of a dangerous condition will not absolve the landlord from liability. This is consistent with Kentucky law applicable to a landlord's duty to keep common areas in reasonably safe condition, which is equally applicable when the landlord retains exclusive control of an area."). Further, the Court, on these facts, sees no material gap between a dumpster enclosure outside an apartment complex and the Owners' garage. *Cf. Carver v. Howard*, 280 S.W.2d 708, 711 (Ky. 1955) (A landlord's duty as to defective conditions in

since Greer last cleaned out the garage rubbish pile. *See* Greer Dep. at 27. When she took the trash down on September 17, 2015, Greer carried at least 5 bags in addition to the Herbie receptacle. *Id.* at 30. There was more trash than the receptacle could handle. *Id.* at 29. Then, she loaded a large box with 5 additional bags and began dragging that down with one hand as she carried yet two more bags with the other hand. *See id.* at 30–32. She felt time pressure because it was trash collection day in the neighborhood, and she could hear the garbage truck in the area. *See id.* at 35. As she pulled the loaded box and walked backward down the drive, she stepped on a loose box and began sliding. She then fell. *See id.* at 30–32. Greer believes the wind blew the loose box, which she had not before seen, from the area of the Rosie recycling bin. *See id.* at 32 ("but it had to be there with the Rosie"); *id.* at 23. Riley agrees that the box came from the house.[20] *See* Riley Dep. at 55 (agreeing "[i]t was either Whitney and Jeff's box, or something that got sent to them one way or another"). The drive was steep, Greer Dep. at 33, and Greer faced the task with no help. She alone had to move a mountain of piled refuse and boxes—either from within or outside the garage—to the curb in time for collection. One of the boxes ended up in Greer's path. The distracted Greer—trying to carry two more bags and pull backward a box loaded with even more five sacks of trash—stepped on the slippery box and stumbled down the driveway.

---

"appurtenances, retained by the lessor for the common use and benefit of a number of tenants" is to "exercise ordinary care to keep in a reasonably safe condition the premises[.]"). The fact that the danger arose from a garage facet over which the Owners' undoubtedly had specific control and, though perhaps grudgingly, accepted responsibility—garbage disposal—cinches the finding.

[20] The Court thus rejects the argument, DE #25 at 2, that there is no proof of the box origin. Further, Greer identified the box as having held a dog crate. The family had a dog. *See* Greer Dep. at 38, 32.

The Owners knew the situation at the home and sent Greer in to deal with the unorganized detritus. A jury could find that they placed her in a scenario of foreseeable and unreasonable risk, given the specifics of the house, the task, the Plaintiff, and the day. The factfinder must weigh the particulars and speak on the matter.

Faced with this testimony and factual situation, "[r]easonable minds" certainly could differ "on the unreasonable-risk question[.]" *Grubb*, 523 S.W.3d at 421 (majority opinion). The reasonableness "of the risk in this case [i]s subject to rational disagreement." *Id.*; *see also Britton*, 817 S.W.2d at 447 (recognizing that "stacking rubbish and boxes . . . too high . . . constitutes acts which might well be viewed as actionable negligence"); *Bielefeld v. Menard, Inc.*, No. 4:17-CV-13-JHM, 2018 WL 662309, at *2-3 (W.D. Ky. Jan. 31, 2018) (holding that the reasonableness of the risk of a "platform lift" in a store is subject to rational disagreement); *Rodgers v. Grant Cnty. Football Boosters*, No. 2016-CA-377-MR, 2017 WL 4570711, at *5-6 (Ky. Ct. App. Oct. 13, 2017) ("conclud[ing] that there clearly remain questions of fact as to whether the flower pot constituted an unreasonable risk, the foreseeability of harm created by the flower pot, and whether the Boosters breached its duty of care"). Reasonable minds could likewise differ on the foreseeability of Greer's injury. *See Shelton*, 413 S.W.3d at 913.

The Court, thus, finds that a jury question exists regarding whether the Owners exercised "reasonable care" to "prevent foreseeable injury" when Riley dispatched Greer to clean Wilmington Lane, considering the loose refuse with which home occupants had littered the garage and the potentiality that such an item(s) could end up in Greer's walking path as she toted trash to the street. If whether a "failure to provide bathmats" for potentially slippery bathtubs presents a jury question on breach, *see Goodwin*, 501

S.W.3d at 899, surely these facts do too. The Owners knew of the waste and box accumulation and asked Greer to the home regardless. The jury will have to parse the facts and perform its revered function to determine if the Owners exercised ordinary care to prevent foreseeable injury when they sent Greer to the Wilmington Lane residence that day.

Kentucky courts have recognized two general exceptions to the normal rule of jury determination; the Court addresses them in turn. First, the parties do not suggest that "public policy" here "require[s]" that this "risk-creating condition be deemed not unreasonable and thus excepted from [the applicable] duty of care." *Grubb*, 523 S.W.3d at 418 (majority opinion). Second, based on the Court's review of the record, this is not a case where Greer's conduct was "clearly the only fault" of her injury. *See id.* The Court further could not say, as a matter of law, that the "risk-creating condition on the property" could not have "been corrected by any means" or that it is "beyond dispute that [the Owners did] all that was reasonable." *Id.*; *see also, e.g.*, *Webb*, 413 S.W.3d at 899-900. Greer "did not fall into a grease pit." *Grubb*, 523 S.W.3d at 419 (majority opinion) (contrasting *Bonn v. Sears, Roebuck & Co.*, 440 S.W.2d 526, 527 (Ky. 1969)). A "rational fact-finder could deem [Greer]'s injuries," at least in part,[21] "the result of [some]thing [other than] her own fault[,]" *id.* at 418, to wit, one of the myriad boxes and waste strewn about Wilmington Lane's garage and Riley's decision to ask her to enter

---

[21] That is the main point of comparative fault: for a jury to apportion blame "based on the extent a party's breach"—even the plaintiff's own breach—of the duty of ordinary care "caused or helped cause harm to the plaintiff." *Carter*, 471 S.W.3d at 298; *see also Grubb*, 523 S.W.3d at 415 ("Under the comparative-fault regime, the fact finder is tasked with apportioning fault for the plaintiff's injuries between (or among) those responsible, with the defendant's liability for the plaintiff's damages proportionate to his or her share of the fault.").

that potentially perilous environment. Accordingly, neither exception is here applicable to resolve the case as a matter of law.

By this result, the Court assiduously avoids "substituting its view of reasonably debatable facts for that of the fact-finder." *Grubb*, 523 S.W.3d at 418 (majority opinion). The "reasonableness of a risk involves some manner of balancing the costs or burdens of mitigating it against the likelihood and severity of the injuries it threatens. In [Kentucky] law, that determination, that balancing is ordinarily deemed a matter of fact to be addressed by the jury." *Id.* at 417. Likewise, foreseeability "depends on the specific facts of the case" and "should be a question normally left to the jury under the breach analysis." *Shelton*, 413 S.W.3d at 913. Accordingly, as to the Owners, the question of breach—including the subsidiary considerations of reasonableness and foreseeability—is for the jury.[22]

## IV.    CONCLUSION

For the reasons, to the extent, and on the terms stated, the Court **DENIES** DE #21. The case shall proceed to trial.

This the 3rd day of July, 2019.

Signed By:

_Robert E. Wier_

**United States District Judge**

---

[22] Riley makes no argument as to negligence elements 3 and 4. The Court's review of the record indicates triable issues as to those elements, as well.